UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANE DOE,

    *Plaintiff*,

v.

BOZZUTO MANAGEMENT CO.,

    *Defendant*.

Civil Action No. 23-3360 (TJK)

## MEMORANDUM OPINION & ORDER

Plaintiff sues Bozzuto Management Company for what she says are discriminatory and unfair policies and practices that limit affordable housing and violate two District of Columbia statutes: the District of Columbia Human Rights Act and the Consumer Protection and Procedures Act. She alleges that when she applied to rent an apartment in a building managed by Bozzuto, she was subjected to more burdensome—and thus unlawful—application procedures because she applied with help from a housing voucher. And although her voucher would have covered all her rent, she asserts that Bozzuto unlawfully denied her application because of her income level and credit score. Bozzuto moves to dismiss under Rule 12(b)(6) for failure to state a claim and to strike her class action allegations under Rule 12(f). For the reasons explained below, the Court will deny both motions, except to the extent that Plaintiff bases her consumer protection claim on alleged misrepresentations or omissions related to the requirements that she apply in-person and pay a security deposit by money order.

**I.   Background**

    **A.   The Complaint**

Plaintiff alleges that she receives rental housing assistance through the District of Columbia's Family Re-Housing and Stabilization Program ("FRSP"), which provides time-limited rental

assistance to families experiencing or at risk of experiencing homelessness. ECF No. 10 at 20 ("Compl.") ¶ 3; *see* ECF No. 16 at 9. The FRSP subsidy guarantees all of Plaintiff's rent and any security deposit, which is paid directly to the landlord. Compl. ¶ 17.

On April 17, 2023, Plaintiff saw an apartment for rent on Bozzuto's website. The apartment was in the Apollo, a building with over 400 units on H Street, N.E. Compl. ¶¶ 8–11. Bozzuto manages 48 multi-unit apartment complexes in the District. *Id.* ¶ 26. After reviewing the online application, Plaintiff visited the Apollo's leasing office, where she was told that because she was a recipient of an FRSP subsidy, she would have to fill out a paper application in-person, rather than online, and pay the security deposit by money order. *Id.* ¶ 11. The same day, Plaintiff submitted a paper application, in which she again disclosed that she receives an FRSP subsidy and that she earns income too. *Id.* ¶ 12. She had to pay a $50 fee with her application. *Id.* ¶¶ 11–13. According to Plaintiff, the income she disclosed was enough to pay the utility costs associated with the apartment. *Id.* ¶ 17. The next day, she was informed via email from the leasing manager that her application was rejected because "[her] risk score failed to meet our community's requirement." *Id.* ¶ 13. She was invited to reapply "with a guarantor or co-applicant" whose credit score could be screened, as "opposed to" hers. *Id.*

Plaintiff responded by asking why her credit and income mattered when Bozzuto would be receiving her "rent in full from the district." Compl. ¶ 14. The manager replied: "while your income doesn't matter for this particular screening, your credit score, which encompasses any loans, faulted/late payments, etc. is still factored in," and "[w]hile DC Housing does pay your rent, you're still responsible for paying the utility charges assessed to you." *Id.* ¶ 15. Later, Plaintiff received a letter confirming that her application was rejected because of her credit score and because she had "insufficient income to support rent." *Id.* ¶ 16. Ultimately, Plaintiff rented alternative housing elsewhere in the District. *Id.* ¶¶ 19–20.

B.     **Procedural History**

In September 2023, Plaintiff sued Bozzuto in the District of Columbia Superior Court. She brings two counts: Count I, for violations of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.*, and Count II, for violations of the Consumer Protection and Procedures Act ("CPPA"), D.C. Code §§ 28-3901 *et seq.*, on behalf of herself and all others similarly situated. Compl. ¶¶ 21, 31–53. She defines the putative class as follows: "All individuals who submitted an application to Bozzuto to lease property in the District of Columbia with a housing voucher or subsidy." *Id.* ¶ 23. And the "[s]ubclass" is "[a]ll individuals who submitted an application to Bozzuto to lease property in the District of Columbia with a housing voucher or subsidy, and whose applications were rejected by Bozzuto on the basis of having insufficient income and/or on the basis of their credit score." *Id.* ¶ 24.

In November 2023, Bozzuto removed this action, asserting that this Court has diversity jurisdiction, or in the alternative, that jurisdiction is proper under the Class Action Fairness Act ("CAFA").[1] ECF No. 1. Bozzuto moves to dismiss the complaint under Rule 12(b)(6) and to strike her class action allegations under Rule 12(f). ECF No. 13.

---

[1] Federal courts have "limited jurisdiction," and even if not contested by either party, the Court must assure itself of its own jurisdiction. *Friends of Animals v. Pruitt*, 258 F. Supp. 3d 91, 93 (D.D.C. 2017). Thus, the Court takes the opportunity to do so now. Of course, a "civil action filed in state court may only be removed to a United States district court if the case could originally have been brought in federal court." *Nat'l Consumers League v. Flowers Bakeries, LLC*, 36 F. Supp. 3d 26, 30 (D.D.C. 2014) (citing 28 U.S.C. § 1441(a)). Bozzuto claims jurisdiction is proper on two grounds. The first is diversity jurisdiction. Federal district courts have diversity jurisdiction if the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1). Both requirements are satisfied here, so the Court may exercise diversity jurisdiction. First, the parties are diverse. Plaintiff is a citizen of the District of Columbia. Compl. ¶ 3. And as for Bozzuto, a corporation is a citizen of any state where it is incorporated or has its principal place of business. 28 U.S.C. § 1332(c)(1). Bozzuto is incorporated in Maryland, and neither party suggests it has its principal place of business in the District of Columbia. Compl. ¶ 4. And though some class members may not be citizens of the District, "unnamed class members are nonparties for the complete diversity requirement of

## II. Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must construe the complaint in the light most favorable to the plaintiff, but the plaintiff "must furnish 'more than labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Tyler v. D.C. Hous. Auth.*, 113 F. Supp. 3d 88, 90 (D.D.C. 2015) (quoting *Twombly*, 550 U.S. at 555).

Under Rule 12(f), the Court has discretion to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "While the decision of whether to strike all or part of a pleading rests within the sound discretion of the Court, striking

---

28 U.S.C. § 1332." *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 297 (D.C. Cir. 2020) (citing *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002)). Second, the amount in controversy is satisfied, although not for the reason cited by Bozzuto. In its notice of removal, Bozzuto argued that because Plaintiff is "alleging a class 'at least in the hundreds,' a reasonable presumption exists that Plaintiff is seeking damages in excess of $75,000, exclusive of interest and costs." ECF No. 1 at 2 (citing Compl. ¶ 26). But "the separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement." *Snyder v. Harris*, 394 U.S. 332, 335 (1969); *see Georgiades v. Martin-Trigona*, 729 F.2d 831, 833 (D.C. Cir. 1984). The same is true for class actions. *See Sloan v. Soul Circus, Inc.*, No. 15-cv-1389 (RC), 2015 WL 9272838, at *6 (D.D.C. Dec. 18, 2015). Even so, "when a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014). And more than $75,000 is at least plausibly at issue, given Plaintiff could seek compensatory, non-pecuniary, punitive, and statutory or treble damages under the DCHRA and CPPA, as well as attorney's fees. *See Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 144 (D.D.C. 2014) ("Attorney fees are part of the amount in controversy if they are provided for by statute or contract." (citation omitted)). Alternatively, the Court has jurisdiction under CAFA as well. Plaintiff has satisfied CAFA's minimal diversity requirement and alleges a class action with members "at least in the hundreds" with an amount in controversy, given the above, plausibly greater than $5 million. Compl. ¶ 26; *see* 28 U.S.C. § 1332(d).

4

portions of a pleading is a drastic remedy, and motions to strike are disfavored." *Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 84 (D.D.C. 2013) (internal quotation marks and citations omitted). Thus, "courts rarely grant motions to dismiss or strike class allegations before there is a chance for discovery." *Id.* at 90.

### III.    Analysis

#### A.    Count I - DCHRA Claim

The DCHRA makes it an "unlawful discriminatory practice" to, among other things, "refuse or fail to initiate or conduct any transaction in real property; or to require different terms for such transaction," "wholly or partially for a discriminatory reason based on the actual or perceived . . . source of income." D.C. Code § 2-1402.21(a)(1). It is also an unlawful discriminatory practice to do so "for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived . . . source of income." *Id.* § 2-1402.21(b). And it is unlawful to do any of the above "to a prospective tenant seeking to rent with the assistance of an income-based housing subsidy based on . . . [i]ncome level" or "a credit score, or the lack of credit score." *Id.* § 2-1402.21(g)(1)(B). There are exceptions for when income level "is below a threshold as required by local or federal law" or, similarly, when "consideration of a credit score or the lack of credit score is required by federal law." *Id.* Source of income includes housing subsidies. *Id.* § 2-1402.21(e); *see* D.C. OHR Guidance No. 16-01 (defining source of income to include "[s]hort- and long-term rental subsidies" including "Rapid Re-Housing" vouchers). A separate "[e]ffects clause" provision of the DCHRA states that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68. A DCHRA claim may be founded on source-of-income discrimination, alone, and need not be "tied to some other protected class." *Blodgett v. Univ. Club*, 930 A.2d 210, 220 (D.C. 2007).

"The Human Rights Act is a broad remedial statute, to be generously construed." *Blodgett*, 930 A.2d at 218. Courts interpreting the DCHRA borrow from federal law "'when appropriate,' that is, to the extent that the acts use similar words and reflect a similar purpose." *Esteños v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008); *see Barot v. Aldon Mgmt.*, No. 18-cv-140 (TJK), 2023 WL 6199075, at *7 (D.D.C. Sept. 22, 2023); *see also Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996) ("The D.C. courts have always looked to cases from the federal courts in interpreting the D.C. Human Rights Act, and have followed, wherever applicable, precedents from the federal courts' treatment of comparable civil rights statutes."). But courts "must be mindful of differences between the federal and D.C. laws, however, which can be significant," and the D.C. Court of Appeals has cautioned that "[a]n overriding difference is that in enacting the DCHRA, the Council of the District of Columbia intended to go above and beyond the protections afforded to employees by Title VII" and other federal civil rights statutes. *Esteños*, 952 A.2d at 886–87.

Though the DCHRA's prohibition on source-of-income discrimination has no equivalent under federal law, Title VIII of the Civil Rights Act of 1968, commonly known as the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, or disability. So the Court looks there for guidance. *See Gatling v. Jubilee Hous., Inc.*, No. 20-cv-3770 (FYP), 2021 WL 5331707, at *7 (D.D.C. Nov. 16, 2021). Under federal law, to make a case of intentional or "disparate treatment" discrimination, a plaintiff must allege that she is "treat[ed] . . . less favorably than others because of [her] race, color, religion, sex, or [other protected trait]." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Discrimination by disparate impact, in contrast, occurs when a practice is facially neutral in its treatment of similarly situated groups but, in fact, "fall[s] more harshly on one group than another." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quotation omitted).

The D.C. Court of Appeals, too, has held that "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rts. Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 424 (1971)); *see also id.* (holding that the DCHRA's "effects clause" "imported . . . the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*").

On summary judgment—to be clear, a stage to which this case has not advanced—when a plaintiff offers no direct evidence of discrimination, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *see 2922 Sherman Ave. v. District of Columbia*, 444 F.3d 673, 682–83 (D.C. Cir. 2006). Under that framework, a plaintiff bears the initial burden to establish a prima facie case of discrimination. "If they succeed, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *2922 Sherman Ave.*, 444 F.3d at 682. "If the defendant meets that burden, plaintiffs may prevail by showing that the defendant's proffered reason was pretext for discrimination." *Id.* "At the motion to dismiss stage, however, a[] . . . discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the [defendant] for the adverse . . . action nor allege pretext to survive a motion to dismiss." *Easaw v. Newport*, 253 F. Supp. 3d 22, 26–27 (D.D.C. 2017) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). But "the plaintiff must still allege sufficient facts 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 27 (quoting *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014)).

Plaintiff alleges that Bozzuto violated the DCHRA when it: (1) rejected her rental application because it refused to apply her housing subsidy income toward her income available to pay

rent and utilities; (2) rejected her rental application because of her income and credit score; and (3) required her to apply in-person (rather than online) and pay her security deposit by money order because she was a recipient of an FRSP subsidy. Although any of these theories would be enough to deny the motion as to Count I, the Court finds that each asserts a viable claim at this stage.

The first theory is straightforward. Plaintiff alleges that, in denying her rental application, Bozzuto refused to consider her housing subsidy income toward its income eligibility requirements. Specifically, she asserts that her application was denied, in part, because she had "insufficient income to support rent," even though her housing subsidy would cover all her rent and she had disclosed enough income to pay any utilities not otherwise covered by her FRSP subsidy. Compl. ¶¶ 16–17. This means, Plaintiff says, that "Bozzuto could only conclude that Plaintiff 'had insufficient income to support rent' by discounting her housing subsidy income." ECF No. 16 at 17–18. The DCHRA prohibits the "refus[al] . . . to initiate or conduct any transaction in real property"—which includes refusing to rent an apartment—based on a source of income. D.C. Code § 2-1402.21(a)(1); *see also id.* § 2-1402.21(b). And as noted above, source of income includes housing subsidies. *Id.* § 2-1402.21(e); *see* D.C. OHR Guidance No. 16-01. This is a textbook allegation of disparate treatment, in this case, because of Plaintiff's source of income. Perhaps that is why Bozzuto does not challenge this allegation as insufficient. *See* ECF No. 13. Accordingly, this allegation states a claim under the DCHRA.

Plaintiff's second theory is closely related to the first. She asserts that even if Bozzuto considered her housing subsidy income as part of her total income level, by denying her rental application based on her income level and credit score, Bozzuto violated D.C. Code § 2-1402.21(a)(1) and (b), which prohibit source-of-income discrimination, as well as (g)(1)(B), which makes it an unlawful discriminatory practice to refuse to rent "to a prospective tenant seeking to rent with the assistance of an income-based housing subsidy based on . . . income level" or "credit

8

score, or the lack of credit score," unless required by law. Compl. ¶¶ 16, 39–40. Plaintiff alleges that she disclosed in her rental application that she receives an FRSP subsidy that would cover all her rent. *Id.* ¶¶ 12, 17. But Plaintiff was told that her application was denied because her credit score was "factored in" and she could apply with a "co-applicant who's [sic] credit score will be screened opposed to yours." *Id.* ¶¶ 13, 15. Finally, she alleges she received a letter notifying her that her application was rejected because of her credit score and "insufficient income to support rent." *Id.* ¶ 16. These allegations also plainly state a claim under the DCHRA that her application was denied both because she is a housing voucher recipient and because of her income level or credit score.[2]

Finally, Plaintiff alleges that Bozzuto violated the DCHRA by subjecting her to more burdensome application procedures because she is a housing-subsidy recipient: that she had to apply in-person rather than online and had to pay any security deposit by money order. Compl. ¶¶ 37–

---

[2] Bozzuto argues that the Court should undertake a "disparate impact" analysis in evaluating whether this claim is adequately pleaded because its credit-score and income-level requirements are "uniform[ly]" applied to applicants, whether or not they have housing subsidy income. ECF No. 13-1 at 17. And, Bozzuto says, Plaintiff has not stated a claim because she has not alleged facts that suggest that Bozzuto's policies disproportionately impact voucher holders—and those policies are justified by its legitimate interests in knowing more about an applicant's financial history and picture. *Id.* at 17–22. Plaintiff counters that Bozzuto's "extended discussion of 'an adequate justification' for 'Bozzuto's credit screening' is misleading: it is illegal in the District of Columbia to deny housing to a subsidized applicant based on their credit score, full stop." ECF No. 16 at 23 (citing violated D.C. Code § 2-1402.21(g)(1)(B)). Whether Plaintiff is right on that point—and the parties have not briefed that issue in any depth—Plaintiff has stated a claim even under a theory of disparate impact. It defies common sense to conclude that uniform credit-score and income-level requirements would not disproportionality impact voucher holders such as Plaintiff, who receives rental assistance intended for those experiencing or at risk of experiencing homelessness. *See Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 29–30 (D.D.C. 2017) (explaining that the "robust causality requirement" to make out a prima facie case of disparate impact "does not require courts to abandon common sense or necessary logical inferences that follow from the facts alleged"). And although at this stage she need not challenge Bozzuto's proffered justifications for its policy, she does so—at least as applied to her—by alleging that her housing subsidy pays for all her rent, and that she disclosed enough income on her rental application to cover her utilities. For all these reasons, her allegations state a claim.

38. Among other things, D.C. Code § 2-1402.21(a)(1) makes it an unlawful discriminatory practice "to require different terms" for a real property transaction "wholly or partially" based on source of income which, as already noted, includes housing subsidies. Plaintiff alleges that she was subjected to different application procedures expressly because of her source of income. *Id.* ¶ 11. Bozzuto advertises online applications but, when Plaintiff went to its offices, she was purportedly told that "because she was a recipient of an FRSP subsidy, she was ineligible to submit an application on-line, and would have to fill out a paper application in person" and "was required to pay the deposit by money order." *Id.* Those allegations of disparate treatment are enough to state a claim under the DCHRA. *See Burrello Grp., LLC v. District of Columbia*, 303 A.3d 618, 624 (D.C. 2023) (advertising that apartments were "not approved for vouchers" was "act[ing] with a discriminatory reason"); *Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1070 (D.C. Cir. 2008) ("Just as it would constitute a facial violation of Title VII to discriminate in leasing on the basis of a renter's race—regardless of whether the landlord professed a 'benign' motive for so doing—it is a facial violation of the Human Rights Act to discriminate on the basis of the renter's source of income.").

Bozzuto counters that because "the voucher application process will *always* differ from a non-voucher application," Plaintiff must allege that Bozzuto harbored animus toward voucher holders. ECF No. 13-1 at 13–15. Not so. Bozzuto says that the voucher process is "more complicated and involved" than it is for non-voucher applications, given regulations in place for a tenant locating an apartment, negotiating a lease, and receiving approval from the District of Columbia Housing Authority. *Id.* at 14–15. But none of that means Plaintiff has failed to state a claim, because none of those regulations require voucher applicants to apply in-person or pay by

10

money order. They remain "different terms" than what Bozzuto imposes on other applicants.³ D.C. Code § 2-1402.21(a)(1). Thus, at this stage, Plaintiff has sufficiently pleaded that Bozzuto acted with a "discriminatory reason" under the DCHRA. *Burrello Group*, 303 A.3d at 624; *cf. Esteños*, 952 A.2d at 891–92 (holding that inference of discrimination could arise based on English-proficiency requirement given that "what on its face may appear a legitimate business requirement, if improperly applied, could constitute unlawful national origin discrimination").

Finally, Bozzuto contends that the DCHRA's prohibition against "requir[ing] different [transaction] terms" implies a materiality requirement, which Plaintiff has not pleaded. ECF No. 13-1 at 15–16. But Bozzuto pulls that requirement out of thin air. Such a requirement does not appear in the statute's text, nor is there case law suggesting as much.⁴ But to the extent there remains any doubt, the Court looks to federal discrimination law for guidance. Until recently, to prove discrimination with respect to an employee's "terms, conditions, or privileges of employment" under Title VII, plaintiffs in some circuits had to show "significant" or "material" harm. But in *Muldrow v. City of St. Louis*, the Supreme Court held that Title VII imposes no such requirement, because "[t]o demand 'significance' is to add words" and "impose a new requirement"

---

³ In *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 396 (S.D.N.Y. 2012), the court considered a similar New York law prohibiting source-of-income discrimination. *See* N.Y. City Admin. Code § 8-107(5)(c)(2) (making it an unlawful discriminatory practice to "use any form of application" for housing which expresses "any limitation, specification or discrimination" as to source of income). The court there held that the defendant's segregated system for dealing with subsidy and non-subsidy clients—including requiring those receiving housing subsidies to meet with an agent at the defendant's offices—violated New York law. *Short*, 916 F. Supp. 2d at 400–01.

⁴ Bozzuto invokes case law that stands for the banal proposition that a plaintiff must allege an injury-in-fact to possess standing to bring her claims. *See, e.g.*, *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 29–30 (D.C. Cir. 1990) (holding that organizational plaintiffs bringing claims under the Fair Housing Act "have to prove that this violation actually caused them to expend resources or to suffer some other concrete injury"). But Bozzuto does not challenge Plaintiff's standing to bring a DCHRA claim.

11

beyond what the law demands "as written": that is, discrimination against an employee with respect to that employee's "terms, conditions, or privileges of employment." 144 S. Ct. 967, 974–75 (2024). So too here. The DCHRA prohibits "requir[ing] different terms" for a real property transaction, not just material or significant ones. D.C. Code § 2-1402.21(a)(1). And it "is a broad remedial statute, to be generously construed." *Blodgett*, 930 A.2d at 218. That said, *Muldrow* suggests that Title VII requires more than a "trifling" harm. 144 S. Ct. at 974–75 (requiring Title VII plaintiffs show "some harm" or "'disadvantageous' change in an employment term or condition" that left them "worse off"); *see id.* at 978 (Thomas, J., concurring in the judgment). But even if the DCHRA does not reach *de minimis* differences in transaction terms—such as requiring those with income subsidies to use different colored pens to sign their rental agreements—the Court cannot say at the motion-to-dismiss stage that requiring Plaintiff to apply in-person and pay a security deposit by money order was such a difference. Thus, these allegations state a claim as well.[5]

**B.    Count II - CPPA Claim**

Plaintiff alleges that the same factual allegations also violate the CPPA, which prohibits "any person [from] engag[ing] in unfair or deceptive trade practices, whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904; *see* Compl. ¶¶ 41–53. Those practices include, in particular, any "misrepresent[ion] as to a material fact which has a tendency to mislead," D.C. Code § 28-3904(e), and "represent[ing] that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," *id.* § 28-3904(e-1). It is also a violation to "fail to state a material fact if such failure

---

[5] *See generally Chambers v. District of Columbia*, 35 F.4th 870, 875 (2022) ("[T]he principle *de minimis non curat lex*—the law is not concerned with trifles—is assumed to be incorporated in every statute, absent an indication to the contrary.").

tends to mislead," *id.* § 28-3904(f), including to "use innuendo or ambiguity as to a material fact, which has a tendency to mislead," *id.* § 28-3904(f-1), as well as to "advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered," *id.* § 28-3904(h).  The CPPA "should be read broadly" to carry out its goal of "protect[ing] consumers from a broad spectrum of unscrupulous practices by merchants." *Qureshi v. Am. Univ.*, No. 20-cv-1141 (CRC), No. 20-cv-1454 (CRC), 2023 WL 2387811, at *2 (D.D.C. Mar. 7, 2023) (quoting *Mod. Mgmt. Co. v. Wilson*, 997 A.2d 37, 62 (D.C. 2010)).

DCHRA violations can support a CPPA "unfair or deceptive trade practices" claim.  *See Mann v. Bahi*, 251 F. Supp. 3d 112, 121 (D.D.C. 2017) ("[T]he CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 28-3904, but to all other statutory and common law prohibitions." (citation omitted)); *id.* ("The plain text of the statute and the relevant D.C. case law confirm that a merchant that presents misleading information about its services in violation of another statute commits an unlawful trade practice, even if that statute is not specifically enumerated elsewhere in the CPPA.").  And "practices that convey information by implication"—such as Bozzuto's representation that it accepts online applications—are "within the reach of the Act." *See Ctr. for Inquiry, Inc. v. Walmart, Inc.*, 283 A.3d at 118; *Mann*, 251 F. Supp. 3d at 126.

Bozzuto moves to dismiss Count II only to the extent it is based on Plaintiff's third theory of liability under the DCHRA: that Bozzuto misrepresented or failed to disclose that as an applicant with an income subsidy, she needed to apply in-person and pay a security deposit by money order.  Bozzuto argues that (1) Plaintiff lacks standing because she was not injured by these

misrepresentations or omissions and that, in any event, (2) they were not "material" under the CPPA.[6]  The Court need not reach the second argument, because Plaintiff has not established standing to bring a CPPA claim based on this theory.

To establish standing, the complaint must have "clearly allege[d] facts demonstrating" she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The injury-in-fact must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  And standing "is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (internal quotation marks omitted).  That is, standing "must be demonstrated for each claim against each defendant." *Whitlock v. U.S. Dep't of Homeland Sec.*, No. 21-cv-807 (DLF), 2022 WL 424983, at *4 (D.D.C. Feb. 11, 2022).

Plaintiff has not plausibly alleged standing on this theory of her CPPA claim because she has not pleaded an injury traceable to these alleged misrepresentations or omissions.  As this court

---

[6] Bozzuto moves to dismiss under only Rule 12(b)(6) for failure to state a claim, which does not govern challenges to standing.  The Court therefore construes this portion of its motion as one to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  Of course, such a motion "presents a threshold challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  "Under Rule 12(b)(1), the plaintiff bears the burden of establishing [subject-matter] jurisdiction by a preponderance of the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  That burden "grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015).  To survive a motion to dismiss, a plaintiff need only allege a qualifying "injury resulting from the defendant's conduct." *Id.* (quoting *Lujan*, 504 U.S. at 561).  The Court must "assume the truth of all material factual allegations in the complaint and . . . grant[] [plaintiff] the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation omitted).

has recognized, "D.C. law is clear that the CPPA is meant to extend as far as Article III's requirements will permit—but it can go no further than that . . . . Thus, if [a plaintiff] only alleged that [a defendant] violated the CPPA without also alleging that [she] was misled or that [she] suffered any harm, that would not be sufficient." *Mann,* 251 F. Supp. 3d at 119. That is the case here, at least as far as these representations or omissions go. Plaintiff purports to rely on alleged economic injury, which no one disputes qualifies as injury-in-fact for standing purposes. *See Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015). But her allegations do not connect her reliance on these misrepresentation or omissions to any economic harm. She represents only in her opposition brief that she "would not have paid for the money order if Bozzuto had disclosed that it refuses to consider income from housing subsidies and evaluates subsidy applicants based on their credit score and income level." ECF No. 16 at 28. Of course, Plaintiff may not amend her complaint in her briefing. *See Fares v. Smith*, 249 F. Supp. 3d 115, 125 (D.D.C. 2017). That aside, in neither her complaint nor her briefing does she allege that she was ever misled by *these* specific misrepresentations or omissions. Similarly, she does not allege that she ever paid a security deposit by money order (presumably because her application was rejected) or that she suffered any other economic harm linked to these misrepresentations or omissions. Thus, standing on her CPPA claim cannot be grounded on these alleged misrepresentations or omissions, and the Court will dismiss Count II to the extent it is based on them.

### C. Class Allegations

Finally, Bozzuto moves to strike Plaintiff's class action allegations under Rule 12(f). ECF No. 13-1 at 25–32. The only reason Bozzuto gives to do so is that Plaintiff's allegations fail to define a legally valid class or subclass under Federal Rule of Civil Procedure 23. But Plaintiff has yet to move to certify the class; the Court extended the time to do so after resolution of this motion. The "exact shape and form of a class action evolves only through the process of discovery." *Ross*

*v. Lockheed Martin Corp.*, No. 16-cv-2508 (KBJ), 2020 WL 4192566, at *2 (D.D.C. July 21, 2020) (internal quotation marks and citation omitted).  And the Court "can permit plaintiffs to flesh out the contours of their proposed class action for certification purposes by engaging in pre-certification discovery, and discovery is especially warranted in cases where, for example, getting more information about the plaintiffs' claims 'will resolve factual issues' such as whether a 'set of subclasses exist.'" *Id.* (citation omitted).  Such is the case here.  And there is no other reason to strike Plaintiff's class allegations, given they are not "redundant, immaterial, impertinent, or scandalous."  *See* Fed. R. Civ. P. 12(f).

### IV.   Conclusion and Order

For all the above reasons, it is hereby **ORDERED** that Bozzuto's Motion to Dismiss, ECF No. 13, is **GRANTED IN PART** and **DENIED IN PART.**  The motion is **GRANTED** insofar as Count II asserts a CPPA claim based on any alleged misrepresentations or omissions by Bozzuto related to its requirements that Plaintiff, as an applicant with an income subsidy, had to apply in-person and pay a security deposit by money order.  In all other respects, the motion is **DENIED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: June 24, 2024